[S. F. No. 8723. In Bank.—August 13, 1920.]

## WILLIAM E. COUGHLIN, Respondent, v. GREAT WESTERN POWER COMPANY (a Corporation), Appellant.

[1] ELECTRICITY—JUMPING OF CURRENT—SCIENTIFIC IMPOSSIBILITY.— It is a scientific impossibility for an electric current of twenty-two thousand volts to jump a distance of twenty-one inches through the air.

[2] ID.—EVIDENCE—JUDICIAL NOTICE—ARCING DISTANCE OF CURRENT. It is a scientific fact of which the court will take judicial notice that if a twenty-two thousand volt wire had been surcharged with a sufficient voltage to jump for a distance of one inch, such additional voltage would have discharged into a lightning-arrester

---

2. Weight of testimony to strange phenomena of electricity, note, Ann. Cas. 1917B, 477.

within one inch of the wire, or into iron beams of the substation within twelve inches of the wire which were connected with the corrugated iron surface of the station so as to form a perfect ground, rather than to the ground through the hand of an electric substation operator at twenty-one inches.

[3] NEGLIGENCE — INJURY TO ELECTRIC SUBSTATION OPERATOR — SAFE PLACE TO WORK.—An electric power company is not liable for injuries sustained by a substation operator from the short-circuiting of a twenty-two thousand volt current through his body while engaged in cleaning a dead wire, on the theory that it had failed to furnish a safe place to work, where the distance between the wires was twenty-eight and one-fourth inches and the place one which was required to be used at most but once a month.

[4] ID.—NEGLIGENCE—WHEN QUESTION OF LAW.—Where all the facts are either shown without dispute or by scientific principles of which the court takes judicial notice, the question of whether or not the evidence is sufficient to support a finding of negligence is a matter of law for the court.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. John Hunt, Judge. Reversed.

The facts are stated in the opinion of the court.

Guy C. Earl and W. H. Spaulding for Appellant.

O'Gara & De Martini for Respondent.

WILBUR. J.—Plaintiff recovered judgment in the lower court for damages sustained by him November 3, 1913, by the short-circuiting of a twenty-two thousand volt current through his body while he was engaged in the work of cleaning certain bushings and wires in an electric substation operated by the defendant, his employer. Defendant appeals. At the time of the injury the Roseberry Act (Stats. 1911, p. 796) was in force, and both plaintiff and defendant had elected to be bound by the provisions thereof. Plaintiff, however, ignored the compensatory provisions of that statute as therein authorized, in cases of gross personal negligence,

3. Master's duty to lineman and other employees to prevent contact of wires carrying electric current, note, 52 L. R. A. (N. S.) 600.

Liability for discharge of electricity from wire injuring person not actually coming in contact therewith, note, Ann. Cas. 1912A, 251.

and brought this action in which the jury found as a fact by necessary implication that the defendant was guilty of such gross personal negligence. Unless such negligence has been proved, the plaintiff cannot recover. The claim of negligence is based upon the failure of the employer to furnish a safe place to work. Briefly stated, the admitted facts are as follows: In the substation were three stationary transformers by which electricity entering at one hundred thousand volts was transformed by induction into a current of twenty-two thousand volts. To prevent the grounding of the high-voltage current, insulators, called bushings, extended four feet six inches above the upper surface of the transformers, which surface was eleven feet five and one-fourth inches above the floor of the substation. In order to prevent the current from leaking over the surface of these bushings it is necessary to clean the surface thereof of dust and other accumulations about once a month, and for this purpose the current was shut off from the one hundred thousand volt circuit. Plaintiff was engaged in cleaning this surface and the uninsulated copper wire leading therefrom at the time of his injury, and for that purpose the current had been shut off from the high-voltage circuit. The injury resulted from the short-circuiting through his body of the twenty-two thousand volt current coming from a station bus distant from the wire being cleaned, at its closest point, between twenty-eight and one-fourth and thirty-one inches. It was unnecessary to clean the surface of the copper wire, as the purpose of the cleaning was to avoid the danger of short-circuiting the current over the surface of the bushing. The plaintiff had been working in the substation a month and knew the voltages carried by the respective wires and believed that the arcing distance from the twenty-two thousand volt wire was only three-eighths of an inch. He had arranged the switches at the sub-station to shut off the current on the one hundred thousand volt wire and retain the current on the twenty-two thousand volt wire, and at the time he was engaged in cleaning the former the twenty-two thousand volt wires were "hot." The arcing distance of a twenty-two thousand volt current to ground under the most favorable conditions is one and two-tenths inches. Assuming that it was properly a part of the duty of the employee not only to clean the bushing, but the copper wire arising therefrom, the question

at issue resolves itself into this: Was it negligence to so ar-
range the substation that a man was required to clean the
wire distant twenty-eight and one-fourth inches from an
uninsulated wire carrying a current of twenty-two thousand
volts? It must be obvious that such a wire could be cleaned
by wiping it with a rag, without bringing any part of the
body sufficiently near the station bus to produce an arc. If
this was a usual place in which a workman was required to
perform duties which would distract his attention from the
perils involved in working in proximity to an uninsulated
high-voltage wire, and there was a possibility of contact by
reason of unconscious or involuntary action, it might readily
be concluded that a finding of gross negligence by the jury
was sustained by the evidence. But this was not a place
where workmen were usually required to work. At most but
once a month were they called upon to perform this service,
and then under conditions which necessitated their careful
attention to the condition of the various wires in the sub-
station. To have come in contact with the one hundred thou-
and volt wire, or within arcing distance thereof (ten and
one-fourth inches) meant instant death. It is evident that
a man engaged in the occasional task which occupied the
plaintiff would naturally be alert to the peril of his position.
At this point it is well to give the plaintiff's statement as to
the conditions attending his injury. He testified that the
current jumped across a space of twenty-one inches to the
back of his hand. If this were a contestable fact, we would
have to assume the correctness of this testimony in deter-
mining the question of defendant's negligence. [1] But
it is a scientific impossibility for a current of that voltage to
jump through the air for that distance and it is shown that
a lightning-arrester with a perfect ground reached within
one inch of the wire. [2] It is a scientific fact of which
we take judicial notice that if a twenty-two thousand volt
wire had been surcharged with a sufficient voltage to jump
for a distance of one inch, such additional voltage would
have discharged into this ground wire at one inch rather
than to ground through the hand of the plaintiff at twenty-
one inches. Moreover, the iron beams of the substation were
within twelve inches of the twenty-two thousand volt wire
and connected with the corrugated iron surface of the sub-
station so as to form a perfect ground, and this would re-

ceive the discharge before plaintiff could have been injured as he states. Plaintiff testified that the rag in his hand was moist and dirty; that he had been flipping the rag about in an endeavor to clean the one hundred thousand volt wire at a point higher than he could reach, and for the purpose also of shaking the dust out of it. It is defendant's contention that his injury resulted from the rag coming in contact with the twenty-two thousand volt wire and thus forming an arc which, once formed, may extend a distance of two or three feet. If the injury thus resulted it is evident that it was occasioned by the carelessness of the plaintiff rather than the gross negligence of the defendant. In determining the credibility of the plaintiff's testimony we may freely concede that he testified with the utmost good faith. It is doubtful if anyone who has survived a stroke of lightning or a short-circuit from a high-voltage wire could either observe, or if he did, could remember the circumstances. But if we assume that his testimony is absolutely true and that the current did leap over this intervening space of twenty-one inches without short-circuiting into the lightning-arrester or any of the nearer metal conductors in the building, it would at once follow that this extraordinary violation of all known rules of the conduct of electricity of that voltage was such as no human being could anticipate, and the failure to anticipate it could not be considered negligence. The defendant in arranging its substation was only bound to make provision for those laws of nature of which one of ordinary prudence engaged in a like enterprise would be required to take notice. [3] Whether, therefore, we regard the circumstances detailed by the plaintiff as an inherent impossibility or, as an extraordinary and unprecedented electrical phenomena, the defendant cannot be held guilty of gross negligence in the arrangement of its electrical devices in the substation. A good deal is said in the evidence and in the briefs concerning the distance which should be maintained between wires carrying a twenty-two thousand volt current and those carrying one hundred thousand volt current. This testimony has no significance in this action, for the reason that such testimony is directed to a condition where both wires are charged with the current they are designed to carry, and has no relevancy to a situation where the one hundred thousand volt wire is "dead." We have, therefore, directed our at-

tention to that situation.  It is proper to say that the testi-
mony of an expert witness to the effect that it was customary
and desirable that a partition should be placed between wires
carrying these voltages, and that such partitions would have
made the place a safe one in which to work, has no signifi-
cance other than to point out the fact that if there had been
a partition between the plaintiff and the twenty-two thousand
volt wire he would not have been injured.  This, of course,
is a self-evident fact.  Mr. Van Norden, an electrical engi-
neer, was asked his opinion as to what precautions could be
made which would make the situation perfectly safe to a man
working where plaintiff worked.  He.replied: "The only safe
method of construction in a point of that kind, and I think
it is general practice, would be to have a barrier or cell wall
outside of the one hundred thousand volt line *to protect the
one hundred thousand volt line from any possible circuit that
might be near it.*  In other words, there should have been
a barrier between the one hundred thousand volt line and
the twenty-two thousand volt line."  He further testified
that the ordinary form of barrier is a thin reinforced con-
crete wall and that the practice was to place each one hun-
dred thousand volt transformer in a separate cell or the three
in a single cell; that is, a room closed at both ends, at the
back and top and open in front.  It developed, however, that
the reason this witness considered the place where plaintiff
was working dangerous was because "it is always dangerous
to work within reaching distance of a twenty-two thousand
volt line, because a man might unconsciously put his hand
out, or his coat might fly out, or in this case the rag that
was in the man's hand, the point of the rag might fly out
as he moved around unconsciously, and either come very
close to the wire, or actually strike it, in which case there
is no question but he would get a short-circuit falling down
into his hand and hence over his body, as it probably was
in this case, because, if it had gone through his body, it
probably would have killed him—down through his shoes
and into the transformer and to the ground.

"Q. Then, as I understand it, it is because the man might
come close to the twenty-two thousand volt wire?

"A. He might, if he was constantly keeping his presence
of mind, he might work up there every day for years and
not actually come close enough to get a shock off of that wire.

Then, again, in an unconscious moment he might do it. It does not seem to me that there is any particular question of negligence, it might be unconscious.''

In response to a question of a juror this witness also testified that the accident would have been impossible' if such a barrier had been erected between the two wires. The arcing distance of a twenty-two thousand volt ·current having been established by expert testimony, the question as to whether or not plaintiff was working in a safe place was not a question for an expert witness, and although the evidence came in in the first instance without objection, motion was made to strike it out. It is sufficient, however, to say that the witness did no more than to call the attention of the court and jury to the obvious fact that a man working within thirty-one inches of a live wire might carelessly or thoughtlessly come in contact with it. Whether or not this constituted either negligence or gross negligence was a question of law and fact. [4] Where, as here, all the facts are either shown without ·dispute, or by scientific principles of which the court takes judicial notice, the question of whether or not the evidence was sufficient to support a finding of gross negligence is a matter of law for the court. In the view we take of the case it becomes unnecessary to determine whether the plaintiff was guilty of negligence or that the defendant was guilty of lack of ordinary care, for we hold, as a matter of law, that the plaintiff failed to establish that gross negligence upon which his cause of action was predicated. For the same reason it is unnecessary to determine whether such negligence is personal, within the meaning of the Roseberry Act (*supra*), and it is unnecessary to pass upon the question of whether the defenses of contributory negligence or assumption of risk are available under the Roseberry Act in cases based upon the gross personal negligence of the employer.

The judgment is reversed.

Olney, J., Shaw, J., and Angellotti, C. J., concurred.

LENNON, J., Dissenting.—I dissent. In this action for damages for personal injuries sustained by the plaintiff while in the employment of the defendant, a corporation engaged in the business of generating, transmitting, and

distributing electricity for lighting, heating, and power purposes, the prevailing opinion reversed the judgment in favor of the plaintiff upon the theory that the evidence adduced upon the whole case did not support the finding of the jury, implied from their verdict, that the defendant was guilty of gross negligence in the maintenance and operation of that part of its power plant where the plaintiff was injured during the course of his employment. The prevailing opinion holds that defendant corporation was not guilty of gross negligence. I cannot concur in this conclusion.

The facts of the case, as I find them from a perusal of the record, are these: Along defendant's main transmission line, which carries electricity at one hundred thousand volts from its generating plant or power-house in Butte County to San Francisco Bay, are several substations. These substations are installed for the purpose of reducing the voltage carried by the main transmission line for distribution from the substations for commercial use in the surrounding districts. At the time plaintiff was injured he was employed as an operator at one of the substations of defendant located at Isleton, California. It is the duty of an operator in such a substation to watch the apparatus and keep it in proper working condition. In this substation where plaintiff was employed were three transformers, standing in a row north and south. They were eleven feet in height, six or seven feet in diameter, and consisted of coils of copper wire in a metal casing, into which the electricity was carried at one hundred thousand volts by means of wires connected with the main transmission line. After being reduced in voltage, the electricity was carried from the transformers at twenty-two thousand volts by wires issuing from the covers of the transformers. The covers of the transformers, which were of boiler iron, were rounded, sloping from the center toward the edges the only flat portion of the surface being a manhole cover about eighteen inches wide and two feet long. Upon the top of each transformer, projecting at an angle therefrom and close to the edge of the transformer shell, were two bushings, four and one-half feet in height and about ten inches in diameter at the bottom, tapering toward the top. The purpose of these bushings, which were made of fibre rings alternating with

fibre discs, was to insulate the one hundred thousand volt wires so as to prevent the electricity running to ground over the metal shell of the transformer. There were also two smaller bushings for the purpose of insulating the twenty-two thousand volt wires issuing from the tops of the transformers, but they are of no importance for the purposes, of this case. In addition to the connection with the main transmission line, the several substations were also electrically connected between themselves, so that, in case of a shut-down at any one substation, electricity could be fed to the district thus affected from other substations.

It was the custom to shut down the substations once a month in order to clean the apparatus of the substations, and this was ordinarily done after midnight when the demands for electricity were at a minumum. There were three operators at defendant's substation at Isleton—Dorman, the chief operator, Post, and the plaintiff. It was arranged to have a general cleaning of this substation after midnight, November 3, 1913, and plaintiff, in compliance with a direction from Dorman, opened the switches for the purpose of shutting off the current from the wires leading into and out of the substation. All of the wires and apparatus in the substation were thus entirely freed from electricity with the exception of the station bus, which consisted of three parallel wires near the roof and about twenty feet from the ground, running east and west (at right angles to the row of transformers) across the south end of the building, and feeders dropping therefrom into oil switches set on the shelf against the south end of the building. This station bus was fed from other substations and carried electricity at twenty-two thousand volts. No cleaning was to be done on the station bus and it was left charged in order to furnish electricity to the neighboring towns and light for the substation while the high-tension bank was shut down during the cleaning process. After the substation was thus shut down the three operators went upon the roof of the building to clean some of the apparatus. They then began to work inside the building and Dorman told plaintiff to "take No. 3," meaning thereby to clean the bushings and wires on the top of the transformer farthest toward the south, known as "No. 3." Plaintiff, standing on the top of the transformer, cleaned its north bushing

and then proceeded to work on the south bushing. After cleaning the south bushing, he began to dust the wire above the bushing. He had a cotton rag, about two feet square, and with this rag reached up as high as he could to clean the upper part of the wire and then, holding the greater part of the rag in his hand, wiped down the wire. Just as he was dropping his hand to his side, the back of the hand was struck by a flash from a live twenty-two thousand volt wire of the station bus, which was just to the south of the transformer upon which plaintiff was standing. The electricity severely burned the back of his right hand and right forearm, and passed through his body, burning the sole of each foot. The shock threw him off the transformer to the floor beneath. On the night in question there was "a very heavy fog, everything was just wringing wet," and this condition prevailed inside as well as outside the substation, owing to the doors of the substation being left open for ventilating purposes. At the time he was injured plaintiff was twenty-one years of age and had been working at Isleton about a month. Although he had worked in electricity to some extent before coming to Isleton, he had no experience with high voltage other than one month's work as an operator at defendant's substation at Cowell. The jury rendered a general verdict in favor of plaintiff for damages in the sum of $6,735.83. On defendant's motion for a new trial the court made an order granting the new trial unless plaintiff stipulated to deduct from the damages awarded the sum of $1,735.83. This was consented to by plaintiff and the motion for a new trial was thereupon denied, whereupon the defendant appealed from the judgment.

It is contended by appellant, and the prevailing opinion holds, that gross negligence has not been proven. The distance between the dead one hundred thousand volt wires which plaintiff was cleaning and the nearest point of the live twenty-two thousand volt wires of the station bus was twenty-eight and one-fourth inches according to appellant's measurements, thirty-one inches according to the estimates of witnesses for respondent. Plaintiff's hand, owing to the thickness of the rag he held and the movement in dropping his hand to his side, was about twenty-one inches from the nearest live wire at the time it was struck. It is pointed

out by appellant that it was testified to at the trial by the expert witnesses, including those who testified for plaintiff, as well as those called by the defendant, that the arcing distance of twenty-two thousand volts of electricity is, under no conditions, more than one and two-tenths inches; that is to say, the air space across which a current of electricity will jump in its effort to reach the ground is ordinarily less than one inch, and, under any circumstances, never greater than one and two-tenths inches. Opposed to this expert testimony is the testimony of the plaintiff that the current "jumped right over through the air and it caught me on the back of the hand." It is further pointed out that, since electricity seeks the path of least resistance and there were other conductors nearer the wire than plaintiff's hand, had the electricity jumped from the wire it would have done so, not a distance of twenty-one inches to plaintiff's hand, but to the conductor the shortest space from the wire, such as the lightning-arrester outside the substation.

The theory is advanced by appellant, in support of the contention that the evidence fails to show any negligence on the part of the company, that, since plaintiff's hand was admittedly twenty-one inches away from the live wire at the time it was struck, plaintiff must have carelessly brought his rag, by shaking or otherwise, or some other conductor, within an inch of the live wire and thus drawn an arc. It is further argued that, if the twenty-two thousand volts did arc twenty-two inches directly to the back of plaintiff's hand, the occurrence was so unheard of and opposed to every known principle of electricity that it was purely an accident and not a danger which appellant was required to guard against in providing for the safety of its employees.

However that may be, and assuming that twenty-two thousand volts could not jump twenty-one inches, there is no reason thus presented for disturbing the verdict in this case. There were no special findings, simply a general verdict in favor of plaintiff. "It is, of course, the duty of this court to treat all of the facts brought out by the evidence which are necessary to support the verdict as having been found to be true by the jury" (*Clark* v. *Tulare Dredging Co.,* 14 Cal. App. 414, 429, [112 Pac. 564, 570]), and, conversely the verdict of the jury cannot be assumed to be based on inherently improbable testimony if there is

other testimony sufficient to support the verdict. Plaintiff's action was based upon the alleged personal gross negligence of defendant in maintaining a live twenty-two thousand volt wire in too close proximity to the place where plaintiff was required to work, because of which plaintiff was injured by a current of electricity which "jumped and passed" from the said live wire "and came against and in contact with plaintiff's right hand and arm." Consistently with these allegations of the complaint, plaintiff might have drawn an arc by a close approach to the live wire with his rag and, the arc having once been formed, it could, according to the testimony of the expert witnesses, be extended for two or three feet. The jury was entitled to infer, from the evidence adduced upon the whole case, that this was the manner in which the current "jumped and passed" to plaintiff's hand despite plaintiff's general statement that the spark jumped directly to the back of his hand. (*Follmer* v. *Rohrer*, 158 Cal. 755, [112 Pac. 544]; *Bancroft-Whitney Co.* v. *McHugh*, 156 Cal. 140, [134 Pac. 1157]; *Lynch* v. *Lynch*, 22 Cal. App. 653, [135 Pac. 1101]; *Turner* v. *Bush* (Cal. App.), 185 Pac. 190.) It is not, therefore, essential to the general verdict in favor of plaintiff, to assume that the jury found that the electricity jumped directly through the air and, without the aid of any intervening substance, the entire twenty-one inches to the back of plaintiff's hand.

Moreover, there was, in my opinion, evidence tending to show the existence of gross negligence, irrespective of the question of the arcing distance of the twenty-two thousand volts of electricity. While the employer is not an insurer of the safety of his employees, he must furnish a place to work in which is "reasonably safe, having regard to the character of the work itself." (*Spivok* v. *Independent Sash & Door Co.*, 173 Cal. 438, 440, [160 Pac. 565, 566].) The jury when arriving at a general verdict were warranted to taking into account the dangerous nature of electricity, the high voltage which the wires carried, the youth of plaintiff, his inexperience in high-voltage work, the fact that he had never before performed the particular duties upon which he was engaged at the time of his injuries. It further appears that at least one expert witness, a consulting engineer, testified that, although twenty-two thousand volts could not arc over one and two-tenths inches, the place in which plain-

tiff was working was not a *safe* working distance from the
live wires, and that, under the circumstances, twenty-eight
and one-fourth inches, or even thirty-one inches, was in
dangerous proximity to the twenty-two thousand volt wire,
because of the likelihood that a person working in that posi-
tion would come sufficiently close to the live wire to produce
a short circuit.  It was stated by this witness, and others,
that the only safe method of construction in a situation of
that kind was the erection of a concrete barrier in the form
of a concrete wall about the transformers; that this was the
general practice; that the wires were thus properly protected
in other substations belonging to the defendant; and that
this "barrier should be there for a twofold purpose—one for
operating purposes and the other for the safety of anybody
working in the cell."  There was testimony, and it is con-
ceded, that if the barrier had been erected in this case the
occurrence now under consideration could not have hap-
pened.  The evidence also shows that the standard distance
between one hundred thousand and twenty-two thousand
volt wires is between thirty-six and forty-two inches, but
in one or two cases where there were building difficulties,
as at Isleton, this distance was cut down.  There is also
evidence that, by installing a switch at a cost of less than
one hundred dollars, it would have been possible to render
the substation entirely free from current by shutting off the
current from the station bus and obtaining light for the
substation from a small transformer-house outside the sub-
station.

While most of the evidence above set forth was by no
means uncontradicted, the weight of the testimony was, of
course, to be determined by the jury.  Viewing the record as
a whole and irrespective of any conclusion this court might
reach from the same evidence, it cannot be said that the
jury was unwarranted in concluding that, even assuming
that the electricity could not directly arc a distance greater
than one and two-tenths inches, defendant failed to exercise
the required degree of care for the safety of its employee
in requiring him, under the above-described conditions and
in an inconvenient location such as that presented by the
transformer cover, to work within twenty-eight and one-
fourth, or thirty-one, inches of a live twenty-two thousand
volt wire and unprotected therefrom.

This, I take it, must be so in keeping with the rule generally accepted and uniformly invoked in the admeasurment of the degree of care required of electric companies for the safety of their employees, and which is to the effect that, while such companies are not required to operate their plants to the point of perfection in so far as concerns the material construction of the plant or the character of the apparatus and appliances, for the reason that they are not insurers of their employees against accident, nevertheless, they are obligated to use reasonable care, that is to say, such care as, under all the circumstances, would obviously be required in a given situation in the construction, maintenance, and operation of their plants. Falling short of this, they will generally be held responsible for resultant injuries to employees. It is a reasonable corollary of this rule that the degree of care to be employed by electrical companies in the maintenance and operation of their plants varies with the degree of danger dependent upon a particular situation, for, obviously, a prudent person, individual or corporate, must augment the character and quantity of the care according to the contingencies of differing and varying situations. Thus, if the danger of injury to an employee is but slight, as, for instance, in a situation involving the likelihood of contact with transmission wires carrying merely a harmless current of electricity, as do ordinary telephone and telegraph wires, ordinary care only will be demanded of the company in the maintenance and operation of such wires. On the other hand, where the transmission wires are heavily loaded with high voltage, a very high degree of care—indeed, the highest degree of care commensurate with human prudence and caution and consistent with the practical conduct of business—is required to guard against accident or death which inevitably follow contact with such high-voltage wires. (Crosswell on Electricity, sec. 234; Curtis on Electricity, sec. 405.) The rule is, perhaps, better stated in the case of *Uggla* v. *West End Street Ry. Co.*, 160 Mass. 351, [39 Am. St. Rep. 481, 35 N. E. 1126], where it is said: "The vigilance and attention required must conform to the nature of the emergency and the danger to which others may be exposed, and is always to be judged of according to the subject matter, the danger and force of the material under the defendant's charge." This being so, then the

question of whether or no the required care has been used is, in the majority of cases, necessarily one for the jury, except when the court can say positively that no reasonable man would have acted in the manner complained of, or that a reasonable man must have acted in the manner complained of. (*Lee* v. *Electric Light Co.*, 140 Pa. St. 618, [21 Atl. 405]; *Southwestern Tel. & Tel. Co.* v. *Woughter*, 56 Ark. 192, [19 S. W. 575].)

With this rule in mind, and having in mind also the facts above referred to, namely, the high voltage, the insecure footing afforded by the cover of the transformer, the youth and inexperience of plaintiff, among other circumstances, I cannot concur in the conclusion of the prevailing opinion that the corporation defendant was not guilty of negligence in the maintenance of its plant or that part of its plant in which the plaintiff was injured while at work for the defendant. And surely if in keeping with that rule it can be fairly said, as I think it can be so said, that the corporation defendant was, under all of the circumstances of the shown situation, negligent in not making a known highly dangerous place reasonably safe to work in with the means at hand to do so, then in view of the further fact that the expenditure of the paltry sum of one hundred dollars by the corporation defendant was all that stood between the plaintiff and reasonable safety from serious injury, it is not difficult to see and rightly say that the corporation defendant was indeed negligent out of all measure and beyond all allowance, in a word, that it was guilty of gross negligence.

I would find no difficulty in demonstrating that such gross negligence was the personal negligence of the corporation itself. But, in view of the fact that the prevailing opinion rests a reversal of the judgment solely upon the ground that the evidence shows no gross negligence on the part of the defendant, it would be an idle act to discuss the question of personal negligence or any of the several other questions involved upon the appeal.

LAWLOR, J., Dissenting.—I dissent. I am in accord with the opinion of Mr. Justice Lennon and shall confine myself to some additional observations. The main opinion rests upon a negative answer to the question, ".Was it negligence so to arrange the substation that a man was required

to clean the wire distant twenty-eight and one-fourth inches from an uninsulated wire carrying a current of twenty-two thousand volts?'' This conclusion is arrived at by a line of reasoning that we will take judicial notice that it is a ''scientific impossibility'' for a current of twenty-two thousand volts to ''jump'' a distance of twenty-one inches; that this was not the place where the plaintiff was 'usually required to work, and that the known proximity of the wires made it imperative for him to ''be alert to the perils of his position''; that, inasmuch as he admitted ''flipping'' the cleaning rag about in order to reach higher on the wire which he was wiping, and also to shake the rag free from dust, ''it is evident'' that the injury was occasioned by his carelessness rather than by any negligence of the defendant; that, moreover, in view of the ''scientific impossibility'' already referred to, it cannot be considered negligence for the defendant to fail to provide against such an extraordinary violation of all known rules of the conduct of electricity as the ''jumping'' of the current over a space of twenty-one inches; and, finally, again calling attention to the ''scientific principle'' that electricity will not ''jump'' a distance of twenty-one inches, it is declared that the evidence does not sustain the implied finding that defendant was guilty of negligence in failing to provide a safe place for the plaintiff to work.

May we take judicial notice that a twenty-two thousand volt current will not ''jump'' twenty-one inches? The general rule as to when a court will take judicial notice is stated in *Dunphy* v. *St. Joseph Stockyards Co.*, 118 Mo. App. 506, 523, [95 S. W. 301, 306]: ''Courts should observe the utmost caution to avoid assuming knowledge of natural facts and laws that are beyond the scope of *common positive knowledge.*'' (Italics mine. See, also, 124 Am. St. Rep. 21, note.) This rule is thus expressed in 15 R. C. L. 1127: ''Judicial notice will be taken of scientific facts which are universally known, . . . but they must be of such universal notoriety *and so generally understood* that they may be regarded as forming part of the common knowledge of every person. . . . Cognizance may not be taken of scientific matters of uncertainty or dispute, or of insufficient notoriety.'' (Italics mine.) And in Curtis on the Law of Electricity, page 3, it is said: ''So dangerous a force as electricity must legally

be considered in the same class as high explosives and other treacherous and destructive agents . . . the power and manifestations of which are fully comprehended only by experts." (See, also, *Brown* v. *Consol. Light etc. Co.*, 137 Mo. App. 718, [109 S. W. 1032]; *Campbell* v. *United Ry.*, 243 Mo. 141, [147 S. W. 788].) Several witnesses did testify that they had never known a current of twenty-two thousand volts to "arc" more than one and two-tenths inches, but Reuben D. Bennett, an electrician, stated: "Electricity is an unknown quantity. They presume that it will 'jump' so far. It never acts the same twice; there is no knowing how far it will go." I do not think that the "arcing" distance of twenty-two thousand volts has been proved to be so invariable as to attain the certainty of a scientific fact, or that it is a matter of such common knowledge or so generally understood as to entitle it to recognition under the theory of judicial notice.

The majority opinion, in discussing the plaintiff's duties in the cleaning of the transformer, states that "it was unnecessary to clean the surface of the copper wire, as the purpose of the cleaning was to avoid the danger of short-circuiting the current over the surface of the bushing." The evidence was in conflict on this point. There was some testimony that it was unnecessary to clean the wires, but the chief operator at the substation testified that it was the practice to wipe the wire, as well as the bushing, and the plaintiff stated that such was the practice and that on the occasion in question he had been ordered by the chief operator to clean the wire. It seems to me from this state of the evidence that the jury may have found that it was customary to clean the wire, or, at any rate, that the plaintiff in cleaning it acted under the instructions of one in authority.

I am particularly impressed by the evidence from which the jury may have decided that the injury was the result of a false policy of economy in failing to erect a concrete wall between the station bus wires and the transformer. The complaint alleged that defendant's attention had, prior to the time when plaintiff was injured, been repeatedly directed to the dangerous proximity of the twenty-two thousand volt wire. The chief operator testified that in a conversation with defendant's electrical engineer, who con-

trolled and supervised changes in substation construction, he said, referring to the spot where plaintiff was injured: " 'We have one awfully dangerous place to work here,' and I showed him this bus, how close it was to the one hundred thousand, and where we had to get up in there to work. . . . I told him it was absolutely unsafe. . . . He says, 'I know it is pretty close. This place is not arranged just as we would like to have it, but we have not got money to spare now to make any changes.' " This witness testified that he had had similar conversations with the superintendent of substations and the superintendent of operations, both of whom acknowledged to him that the place was unsafe, but said that the company could not afford to install safety appliances. As Mr. Justice Lennon points out, the expenditure of one hundred dollars would have rendered the place safe. The defendant was under the duty of providing a reasonably safe place for the plaintiff to work, and it must be implied from the verdict and the order refusing to grant a new trial on the claim of insufficiency of evidence that the defendant failed to perform this duty. There is nothing in the Roseberry Act to indicate that the term "personal gross negligence" implies that actual knowledge of the dangerous condition of the premises must be brought to the attention of the officers of a corporation before the failure to remedy such condition becomes the negligence of the corporation.

I therefore conclude that it cannot be held, without invading the province of the jury, that, upon the application of the theory of judicial notice, or otherwise, "the plaintiff failed to establish that gross negligence upon which his cause of action was predicated"; nor that the plaintiff was careless in wiping the wires; nor that the defendant was not guilty of personal gross negligence in failing to provide a barrier between the station bus wires and the transformer.

Rehearing denied.

All the Justices, except Lawlor, J., and Lennon, J., concurred.