[Civ. Nos. 21436, 21437.   Second Dist., Div. Three.   Aug. 2, 1956.]

HANK J. WILBUR, Appellant, v. OFFICE OF THE CITY CLERK OF THE CITY OF LOS ANGELES et al., Respondents.

[Two Cases.]

Hank J. Wilbur, in pro. per., and Hugh R. Manes for Appellant.

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, George William Adams and Weldon L. Weber, Deputy City Attorneys, for Respondents.

VALLÉE, J.—The chief deputy city clerk of Los Angeles discharged petitioner from his position as an accountant in the field audit section of the license and sales tax division of the office of the city clerk, a position in the classified civil service. Petitioner occupied the position from June 21, 1948, until he was discharged on August 25, 1953. Petitioner filed with the board of civil service commissioners, referred to as the board, a request for an investigation into the propriety of his discharge. (Stats., 1945, ch. 102, p. 3102.) Hearings were had before a hearing examiner who made and submitted findings to the board with a recommendation that the discharge be sustained. The findings and recommendation were adopted by the board as its decision. Petitioner then filed a claim for reinstatement and unpaid salary with the city clerk and the board. (Stats., 1937, ch. 79, p. 2858.)[1] The claim was denied by the city clerk and the board.

On February 3, 1955, petitioner filed a petition for a writ of mandamus to compel respondents to restore him to his former position. An alternative writ was denied on the ground the petition did not state a cause of action for the reason, among others, that the transcript of the proceedings before the board was not incorporated in the petition. Petitioner appealed from the order denying the writ (Civ. No. 21436). On April 6, 1955, he filed a second petition for a writ of mandamus. The superior court denied an alternative writ after reviewing the record before the board. Petitioner appealed from that order (Civ. No. 21437).

Petitioner asserts the decision of the board was arbitrary, unreasonable, and unsupported by the evidence.

The notice of discharge given to the petitioner, copied in the

---

[1] "Sec. 112½. Whenever it is claimed by any person that he has been unlawfully . . . discharged, and that such . . . discharge is ineffective for any reason, any claim for compensation must be made and a demand for reinstatement must be presented in writing within ninety days following the date on which it is claimed that such person was first illegally, wrongfully or invalidly . . . discharged."

margin,[2] gave as the reason for his discharge insubordination, in that he refused and failed on many occasions to obey directions and orders of his superiors. It was signed by "Foster R. King, Chief Deputy and acting City Clerk." The hearing examiner found that the charge of insubordination was sufficient and fully supported by the evidence.

The question is whether there was substantial evidence before the board to warrant the discharge. Section 1094.5 of the Code of Civil Procedure in material part reads:

"(b) The inquiry in such a case [as this] shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. . . ."

Abuse of discretion is established if the court, on hearing the petition for a writ of mandate, determines that the findings are not supported by substantial evidence in the light of the whole record. (Code Civ. Proc., § 1094.5, subd. (c).)

■ The scope of review of findings of a local administrative agency is in terms of substantial evidence rather than the weight of the evidence. (*Thompson* v. *City of Long Beach,* 41 Cal.2d 235, 239-240 [259 P.2d 649] ; *Cantrell* v. *Board of*

---

[2]"Reason for Discharge  Insubordination, in that Mr. Wilbur refused and failed on many and various occasions to obey directions and orders of his superiors, all as is more fully set forth in Exhibit 'A' attached hereto and by this reference made a part hereof.

### "EXHIBIT 'A'

"Although Mr. Wilbur is a well-informed man, familiar with organizational rules and procedures generally, as well as ordinances and rules designed to govern the conduct of City employees, particularly those employed in the office of the City Clerk, nevertheless, at all times herein, he has deliberately refused and failed to carry out instructions and obey orders of his superiors. The following instances are cited as examples of his insubordinate conduct:

"1. In March of 1953 Mr. Wilbur was requested by his immediate superior in the Field Audit Section, Mr. S. A. Woodhouse, to rewrite certain working papers prepared by him. Mr. Wilbur refused to rewrite said pages. Mr. S. E. Weiss, Principal Accountant in charge of the Field Audit Section to which Mr. Wilbur was assigned, then requested that said papers be rewritten. Mr. Wilbur again refused to comply with said instructions of his superiors and has never complied with them.

"2. On August 3, 1953, at a general meeting of the Field Audit Section to which Mr. Wilbur was assigned, a new record form (Time Consumption Report) was introduced by Mr. S. E. Weiss, Principal Accountant in charge of the Field Audit Section. Mr. Wilbur questioned the use of the form and stated that he would not use it. He also questioned the authority of Mr. Weiss to introduce the form and,

*Supervisors,* 87 Cal.App.2d 471, 475 [197 P.2d 218].) If the findings of the board of civil service commissioners are supported by substantial evidence in the light of the whole record, our function ends.

■ The record before the board shows: Mr. Woodhouse was petitioner's immediate superior. Mr. Weiss was in charge of the field audit section in the city clerk's office. In a meeting of the field audit section held on August 3, 1953, petitioner questioned the ethics and wisdom of his superior in introducing a new form of time-consumption report to be used by employees in the field. After an altercation with Mr. Weiss, his superior in charge of the field audit section to which petitioner was assigned, in which he stated he would not use the form, he left the meeting and complained to Mr. King, the acting city clerk, who told him to submit his account of the happenings in writing. He told Mr. King "there is a possibility that I said something to make Mr. Weiss mad." Following this conversation petitioner wrote three letters to Mr. King.

in violation of City Clerk's Rule No. 10, stated that he intended to write to the City Administrative Officer concerning the form. Mr. Wilbur did not take the matter to his immediate superior, but, again in violation of City Clerk's Rule No. 10, he took it directly to the office of the Chief Deputy City Clerk and wrote the letter referred to in paragraph (3) below.

"3. In a letter dated August 3, 1953, addressed to and received by Mr. Foster R. King, Mr. Wilbur stated that he would under no circumstances continue his services under anybody under the jurisdiction of Mr. Weiss, and requested new instructions as to whom and where he should report for work.

"4. On August 5, 1953, Mr. Foster R. King notified Mr. Wilbur, in writing, that his demand for a transfer to other work was denied and instructed Mr. Wilbur to continue to report to Mr. Woodhouse, Mr. Wilbur's immediate superior, for work assignments in the Field Audit Section. In reply to this directive, Mr. Wilbur, in a letter dated August 5, 1953 addressed to Mr. Foster R. King, stated that he would not return to the office or enter Room 245 as long as Mr. Weiss remained in charge and that, unless he was assigned working space outside of Room 245, he would complete the audits in his possession at his home. As a second reason for his refusal to obey orders, Mr. Wilbur referred to his previously expressed reluctance to work in the Field Audit Section at all, regardless of who was in charge.

"5. In a letter dated August 7, 1953, Mr. Foster R. King, Chief Deputy City Clerk, advised Mr. Wilbur that no employee possesses the right to demand a certain assignment or determine the place in which he shall perform his duties; and that his previous decision in the matter, which was arrived at after serious consideration, was repeated and reaffirmed. Mr. King thereupon directed Mr. Wilbur to report to Mr. Woodhouse on each working day in Room 245 of the City Hall, and to carry out such assignments as may be handed to him by Mr. Woodhouse, in such manner and at such times as he may be directed by Mr. Woodhouse. To date, Mr. Wilbur has never complied with, nor evidenced any intention of complying with, said order."

On August 3, 1953, he wrote he had stated to Mr. Weiss that he "would not fill out the forms because [he] could not see any improvement in the efficiency of the audit activity through the use of these ill advised and impractical forms . . . that [he] would not use the form anyway." In the letter he said he would not return to the office, he would finish the audits he had already started; and requested he be told where he should continue his services and to whom he should report, that he would not report to Mr. Weiss. On August 5 Mr. King instructed petitioner to continue to report to Mr. Woodhouse for work assignments in the field audit section. On August 5, after receiving the instructions, petitioner wrote Mr. King, saying that he repeated he would not return to the office under Mr. Weiss and that he would continue bringing to an end the assignments on hand, doing write-ups at home in case he was not assigned working space outside the room in charge of Mr. Weiss. On August 7 Mr. King wrote petitioner to the effect that he (petitioner) did not have any right "to demand any specified work assignment or to determine the place in which he shall perform his duties," that petitioner had not followed the procedure relating to "employee grievances," again directed him to report to Mr. Woodhouse and carry out such assignments as he should direct, that he (Mr. King) had been informed petitioner "asserted inability to report for work," that "[y]our absence because of this asserted illness will not be recognized unless you provide proof satisfactory to this office in the form of a certificate from a licensed physician"; that petitioner was "expected to get in line"; and "[i]f you are determined otherwise, fairness to yourself, to the City, and to this office, suggests your resignation." On August 14 petitioner wrote Mr. King that for "several weeks I have been and I still am under doctor's care"; that he had not mailed the requested certificate because Mr. King would doubt its veracity; that he be allowed to take his annual vacation with pay starting August 24; that at the end of the vacation he would "be better able to decide about [Mr. King's] kindly suggestion regarding a possible resignation"; and that he would mail to Mr. King's office several audits which he had prepared "as far as possible." All of these letters are set forth in full in the petitions for the writs. On August 25 Mr. King sent petitioner the notice of discharge.

Petitioner performed his duties until August 7. Work

done by him between August 3 and 7 was work which had been assigned to him before August 3. It was the same work mentioned by petitioner in the letters of August 3 and 5 that he would finish at home. No new work was assigned to him because he failed to report for work.

On August 7 petitioner telephoned the office of the city clerk that he was ill. He introduced in evidence before the hearing examiner two letters from a physician concerning his health. The first one was dated August 27, 1953, and was received by the city clerk on August 30. It says that petitioner had been under the doctor's care since August 1, 1953, and was still receiving treatment. It did not state that petitioner was unable to work. The second letter was dated September 21, 1953. It was not received by the city clerk until November 2, three months after petitioner assertedly became ill and nine weeks after he was discharged. The letter is substantially the same as the first one except there was added, "Mr. Wilbur was unable to work from August 7 to September 14, 1953."

Petitioner argues that a failure to report for duty because of illness cannot be construed as insubordination. Mr. King testified he discharged petitioner for not obeying orders. At no time did petitioner advise the city clerk that his refusal to obey orders was because of illness.

As said by the learned trial judge, "The letters which petitioner has pleaded in full, in and of themselves, would seem to be evidence sufficient to support the charge of insubordination." At no time did petitioner retract the refusals to obey orders contained in his letters to Mr. King. He did not attribute his refusals to illness. There was no showing before the hearing examiner of willingness to comply with the reasonable orders of his superiors. The record shows a clear case of insubordination. ■ Insubordination is the wilful refusal to obey the reasonable orders of an employer. (*Board of Education* v. *Swan*, 41 Cal.2d 546, 552 [261 P.2d 261].) Petitioner reduced his insubordination to writing, signed it, and has never since either obeyed or expressed a willingness to do so. ■ It was for the board, not the courts, to decide whether petitioner was discharged because he failed to report for work on account of illness or because he refused to obey orders. The findings of the board are supported by substantial evidence in the light of the whole record, petitioner had a fair trial, and there was no abuse of discretion.

*Drake* v. *Nash*, 136 Cal.App.2d 410 [288 P.2d 594], was mandamus to compel the restoration of the petitioner to his

position with the city of Los Angeles. The court stated (p. 414):

"Section 112(a) of the charter [Los Angeles] reads in part: '. . . the order of said board [Civil Service Commissioners] with respect to such removal, discharge or suspension shall be forthwith certified to the appointing board or officer and shall be final and conclusive.' When an investigation, as in this case, is made into the removal of a city employee, by the board of civil service commissioners, their decision—by the very terms of the charter—is placed beyond the reach of any judicial review."

The charter of Los Angeles provides that any officer having the power of appointment of employees in any department of government of the city shall have the power to discharge any employee of such department. (Stats., 1945, ch. 102, p. 3102.) Petitioner asserts the board of civil service commissioners exceeded its jurisdiction in ruling that Mr. King, the chief deputy city clerk, had the power to discharge him. The point cannot be sustained.

The powers of municipal officers are prescribed by the provisions of city charters and ordinances passed pursuant thereto. (Const., art XX, § 16; *Craig* v. *Superior Court*, 157 Cal. 481 [108 P. 310]; 18 Cal.Jur. 974, § 250.)

The discharge of a public employee from his position of employment is essentially an administrative matter. (*Board of Education* v. *Ballou*, 21 Cal.App.2d 52, 55 [68 P.2d 389].)

The law contemplates that municipal officers shall exercise their functions within the municipal limits, and provision is usually made for the performance of their functions by others when the officers themselves are absent from the municipality. (37 Am.Jur. 893, § 273.) When one accepts and holds a municipal position subject to certain conditions that are imposed by the law of the city whose agent or servant such person is, and if a cause of removal and a mode of enforcing it are provided by law, then such officer or employee is deemed to have accepted his office or employment on condition that he may be removed for that cause and in the manner provided by the law. (*Alexander* v. *Scattergood*, 51 Cal.App. 2d 127, 132 [124 P.2d 151].)

Ordinarily the power to discharge a municipal employee is in the agency which is empowered to appoint him. However, a municipal employee may be discharged by the agency empowered by statute or city charter or ordinance to effect his discharge. (62 C.J.S. 1508, § 735.) A deputy

is one authorized to exercise the office or rights which the officer possesses, for and in place of the latter. Where the principal is unable to perform the duties of his office, it devolves on the deputy to do so. (2 McQuillin, Municipal Corporations (2d ed. rev.) 68, § 439.) Obviously these rules apply to a chief deputy.

One of the officers of the city is the city clerk. (Stats. 1925, ch. 5, p. 1039.) All officers of the city have such deputies and assistants as the city council by ordinance prescribes. (Stats., 1925, ch. 5, p. 1040; Stats., 1929, ch. 4, p. 1994.) Ordinance 89100, adopted by the council, created the position of chief deputy city clerk. Ordinance 100179 authorized the employment of one chief deputy city clerk in the office of the city clerk. Ordinance 89100 in section 4.5 provides:

"Official Copy of Class Specifications in Classification Plan: (a) The General Manager of the Civil Service Department shall prepare and maintain a written specification for each class of positions and such class specifications when approved and adopted by the Board of Civil Service Commissioners shall constitute the official specifications of classes in the City service. . . . Each class specification shall set forth the title of the class, a general statement of duties, a statement of distinguishing features of the work, examples of duties of positions in a class, a statement of qualifications necessary and desirable for efficient performance of the work and such other pertinent information as the Board of Civil Service Commissioners deems appropriate."

Pursuant to section 4.5 the civil service commission approved and adopted written specifications of the duties of the chief deputy city clerk as:

"Acts as City Clerk in the absence of the City Clerk."

"This position encompasses within its authority all of the functions of the City Clerk."

"Acts as the City Clerk in the latter's absence from his duties, and represents him officially, when directed to do so, at meetings of governmental officials, etc."

Petitioner introduced a copy of the specifications at the hearing, saying "it describes the obligations, the duties and authority of what is designated as Chief Deputy City Clerk." The quoted provisions are valid. (*Cf. Dierssen* v. *Civil Service Com.*, 43 Cal.App.2d 53, 60 [110 P.2d 513].) Under the provisions referred to, the chief deputy city clerk during the absence of the city clerk from the city is the city clerk.

Mr. Peterson, the city clerk, was absent from Los Angeles

from August 3 to August 27, 1953. During that time Mr. King served as acting city clerk. During the absence of the city clerk it was the practice for the chief deputy to serve as city clerk. Mr. Peterson testified his office could not function "unless someone were acting in full capacity in a position to make decisions in my absence," and that Mr. King as acting city clerk had hired employees. It will be recalled that petitioner was discharged by Mr. King on August 25. Mr. King was at that time the acting city clerk; he was the employing and discharging officer. Power is not delegated to him; he is designated to act as and to be the city clerk with all the powers of the city clerk. We think it clear that the chief deputy city clerk had the power to discharge petitioner. It would seem that such power is indispensable to enable the municipality to perform its functions.

We hold that under the charter and ordinances of Los Angeles in effect at the time in question, the chief deputy city clerk had the power during the absence of the city clerk from the city to discharge petitioner subject to his right to have the discharge reviewed by the board of civil service commissioners.

The orders appealed from are affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 25, 1956.